Our last case of the morning is case number 118129, Commonwealth Edison et al. v. Illinois Commerce Commission et al. Are the parties ready to proceed? I understand the appellees, by order, have been allowed to split your time. You'll be responsible for keeping track of that on your own. Proceed. Good morning, Madam Chief Justice, Your Honors. May it please the Court. My name is Jonathan Amarillo, and I represent the Illinois Competitive Energy Association and the Illinois Industrial Energy Consumers. Your Honors, as you know, the subject of this dispute is FutureGen 2.0, a planned clean coal power plant that, for at least the next several decades, is expected to produce energy at a price far in excess of the going market rate. In fact, at least five times the current market rate. And I mention that point because I think it's important, because in very practical terms, it explains why we're here today. Illinois is a competitive energy market, and in any competitive market, no one is going to pay $5 for a commodity when they can pay $1 for the exact same commodity. And because of that basic economic fact, the FutureGen alliance was having difficulty attracting the $650 or $700 million that it needed to get started on top of its billion-dollar program. And no one wanted to buy their overpriced electricity, and their potential investors recognized that fact. So they went to the Commission, and they went to the IPA, and they asked them to force utilities and alternative retail electric suppliers, ARIES, to buy all of their electricity and to be locked into decades-long contracts on that, against their will. Now, from FutureGen's perspective, that, of course, instantly solved their demand problem by mandating into existence a false market for its electricity. But it also simultaneously assured its potential investors that they would turn a profit on the project, because that profit would be guaranteed out of the pocketbooks of Illinois ratepayers. The IPA and the Commission agreed to that plan with some modifications, and they pointed to Section 1-75d5 of the IPA Act. This is what the parties called the retrofit provision, for their authority to force ARIES into those contracts and their authority to have utilities act as their agents under the alternative plan in that regard. The problem, of course, is that the retrofit provision doesn't give the Commission those powers, and there's a reason for that. Neither the IPA Act nor the Public Utilities Act gives the Commission those powers, because the legislature very clearly established a competitive market in Illinois, a market free of exactly the kind of top-down, command-economy decision-making that the Commission seeks to impose here. So what does the retrofit provision actually say? Well, it says that the Commission may approve, quote-unquote, utility sourcing agreements proposed by the owners of retrofitted facilities like FutureGen. The Commission argues that the plain language of that phrase gives it the power to force ARIES into contracts with FutureGen. It claims that its power in this regard is plenary. In fact, it claims that its power is so absolute over these matters relating to clean coal that it is, quote, not required to implement any directive of the General Assembly when executing it. Now first, I have to note that the ICC misuses that provision in the IPA Act. This is Section 1-75B44, which actually states that the Commission, quote, shall implement any directive of the General Assembly. Regardless, the Commission here is completely overreached. The retrofit provision says that the Commission can approve utility sourcing agreements. It doesn't say ARIES sourcing agreements. It doesn't say utilities and ARIES sourcing agreements. It says utility sourcing agreements. And that's important because the term utility and the term sourcing agreement as it pertains to utilities are specifically defined in the statutes, just as the term ARIES and sourcing agreement as it pertains to ARIES are expressly defined in the statutes as well. In fact, Your Honors, they're not just defined in the statutes. They're separately and exclusively defined in the statutes. So this means that when the legislature was using the term utility sourcing agreement in the retrofit provision, it was using a term that it expressly defined multiple times to exclude ARIES. And yet the Commission now seeks to include them in that term. And that's why we said in our briefs repeatedly that this really is a simple case of statutory construction. Now, granted, as I've discovered over the course of this case since taking it on, there are a few things about electric market regulation that are simple. But this really is one of them. It's a fundamental thing, the difference between utilities and ARIES. And that is ultimately what this case can be boiled down to. The legislature defined the controlling terms for us, and the Commission now seeks to ignore those definitions and to impose its own. Now, the Commission claims, I should add, rather remarkably, that those terms aren't defined in the statutes. But, of course, we know for a fact that they are. They're right there in black and white. They're in Section 1-10 of the IPAA Act. They're in Sections 3-105 and 16-102 of the Public Utilities Act for all to see. Instead of acknowledging that. So how do you address opposing arguments' point that ARIES is excluded from the terms electric utility and public utility, but not the generic utility provision? I think it's an absurd argument, Your Honor. No one contests that utilities are public utilities and electric utilities. Or rather, the other way around. Public utilities and electric utilities are utilities. When the Commission makes that argument, it doesn't cite a single provision in the entire statutory scheme where the term utility is used to refer to anything but a public utility or an electric utility, or in some limited cases, a gas utility. And the Commission doesn't cite a single provision where the term utility is used to refer to an ARIES, which is what they're trying to do here, except, of course, in the retrofit provision we're debating. In fact, if you look at the statute, as I'm sure you will, Your Honor, already have, the standalone term utility is used throughout the statutory scheme to refer to, in undeniable circumstances, only utilities and not ARIES. In fact, in several points throughout the statutory scheme that we point out in our brief, the statute says utilities with no prior adjective, no electric or public, just utilities and alternative utility electric suppliers. So I don't think there's any merit to the distinction that they're trying to draw there, Your Honor. The Commission also argues that because the retrofit provision gives it the power to consider sourcing agreements that are proposed by retrofitted facilities like FutureGen, and because the legislature allowed the owners of those facilities to propose agreements to the IPA and the Commission, that it would be illogical if the legislature didn't also give them the power to will those contracts into existence. But the Commission, Your Honors, if you read their briefs closely, they never explain clearly why that's the case, why that would be illogical. And there's a reason for that. It's not illogical. This isn't an ambiguity. There's no inconsistency here. This isn't a case of legislative oversight. It makes sense that the statute reads that way, and it makes sense for at least two reasons. First, the retrofit provision discusses sourcing agreements that may be proposed to the IPA. The use of the word agreement in its very plain and ordinary sense presupposes the existence of mutual assent, a voluntary bargain entered into between two parties. Here, it would be the owner of a retrofitted facility in an area. We don't have that here. Second, it makes perfect sense for the Commission to consider such agreements, if they're ever actually freely reached, because doing so allows the IPA and the Commission to do their jobs better. In this context, Your Honors, their job is very clear. It's to help utilities plan for the power needs of their eligible retail customers. And it helps them do that because it helps them analyze basic market conditions. I think it's worth remembering on this point, Your Honors, that ARIES now make up over 80% of the retail market in the state. So how can the IPA and the Commission be expected to do their job and regulate that remaining 20% for utilities and their eligible retail customers if they don't look at what the other 80% of the market is doing? They can't. So there's really no inconsistency here. In fact, the statutory language is entirely consistent with the legislature's stated goal of making ARIES the centerpiece of the competitive market and to bring the advantages of that competitive market to utilities' eligible retail customers. That's why the IPA as an agency exists, after all. That's why procurement plans exist. Procurement plans exist. And that brings me to my next point, which I think is really important to understand, just the fundamentals of what we're talking about today. Procurement plans were never meant to regulate ARIES. As ComEd argued before the appellate court, procurement plans were designed to regulate utilities. When the legislature created the IPA as an agency, it stated its reasons for doing so incredibly clearly. It said it was to bring the advantages of the competitive market to utilities' eligible retail customers through procurement plans. It made that clear in its legislative findings and declarations, Section 1-5 of the IPA Act. It made that clear in the section laying out the IPA's general powers, Section 1-20. It repeated it again in the section specifically addressing the IPA's procurement planning authority, Section 1-75 of the same statute. In those sections, the legislature stated very, very clearly that the purpose of the IPA was to develop electricity procurement plans for the eligible retail customers of utilities. It made no similar statements anywhere in the statutory scheme regarding ARIES and their competitive customers. Even though, I should point out, at that point, ARIES had already existed for several years at that point. And yet here, despite all of this, the IPA and the Commission included ARIES and their competitive customers in the procurement plan against their will. Now, I should point out that their argument on this point has shifted a bit. Originally, they argued that the statutes expressly gave them the power to include ARIES in the procurement plans. Now, I think taking a cue from the appellate court majority, their argument has shifted toward one that relies more on implied power theory. But their argument is essentially either way, that because the legislature didn't specifically forbid them from using procurement plans to regulate ARIES, and because the legislature didn't explicitly forbid them from forcing ARIES into contracts with FutureGen, then they're free to do so. But as this court is all too aware, that is not how implied administrative power theory works. The absence of statutory authority is not taken as proof of its implied existence. Cases from this court, like City of East St. Louis v. Financial Advisory Authority, teach us that implied administrative authority is not an end run around statutory language. It's not a trump card that can be just easily invoked. And as this court made clear in cases like Barthel v. Illinois Central Railroad, this is especially true in cases like this one, when we're dealing with a statute that's in derogation of the common law, the Public Utilities Act. Agencies cannot lay claim to an implied administrative power unless they can show first, that it doesn't contradict the express terms of the statute. Here, finding an implied power would do exactly that, because of legislature's use of the term utility sourcing agreement. And second, agencies can't lay claim to an implied power unless they can show that it is similar in kind to a power that was expressly granted by the legislature. Otherwise, you have agencies with virtually unlimited power. Or as the commission itself claims to be, an agency that is not required to implement any directive of the General Assembly when administering clean coal issues. That's a remarkable statement in itself. But the point here is that the commission can't identify a single provision in either the IPA Act or the Public Utilities Act, granting it a power that is similar in kind to the power that it's claiming here. Now, it must be said that granting the commission the power to compel utilities to enter in these kind of contracts really can't be described as similar in kind to the power that we're discussing here, because utilities in areas are fundamentally different entities. It's comparing apples and oranges. Utilities, it must be remembered, are the last remnants of that old vertically integrated system where they controlled everything. The generation, the transmission, the sale of it into your homes and businesses. Areas are the exact opposite. They're private, independent companies operating on the competitive market. Their only job is to supply electricity on a competitive retail basis. They sell it to you in your home. They sell it to you in your business. So unlike areas, it makes sense for utilities to be more heavily regulated, because they own all the hardware, the wiring that brings the electricity into our homes and our businesses. Areas don't. Utilities are critical to maintaining supply. Areas aren't. So they're completely different types of entities with completely different roles in the competitive system. What's primarily at issue here isn't the relationship between power generators and utilities. It's the relationship between generators and areas. So when we're talking about powers that are similar in kind, I think the only reasonable comparison is to look at a provision or look for a provision in the statutory scheme that mandates areas to enter into contracts with another private party, another private power generator. The only example of that that we can find in the entire statutory scheme relates to the initial clean coal power plant. Now, it should be said that the initial clean coal power plant was a completely separate project that was to be set up in Taylorville. All the parties agree FutureGen is not that. But when it was discussing the initial clean coal power plant, the legislature was very clear. It expressly stated that areas would be required to enter into sourcing agreements with that facility, showing us that when the legislature meant to include such a requirement, it knew exactly how to do it. We don't have that here. Counsel, may I ask you a question in relation to the supplemental briefing that was requested? There is no initial power utility. There is no FutureGen II. There is no billion dollars. And there's legislation pending across the street. Why are we here? We don't believe this case is moot, Your Honor, because the suspension of federal funding is just that. It's a suspension. Both FutureGen and ComEd agree with us on this point. The commission doesn't take a stand on it. But that decision can be reversed at any time. In fact, as we speak, FutureGen's lobbyists are lobbying Congress hard for exactly that outcome. As long as the FutureGen alliance exists and these orders are in place, and they are still in place, this case is not moot. But even if the court finds that it is moot, we believe that the court should consider these issues under the public interest exception. And just a couple of quick points on that. There's no question that this case presents a matter of public nature. This case presents a question of statutory interpretation and first impression. But even more directly, these orders impose, as I said, a $650 or $700 million obligation on the rate payers of Illinois to finance or rather to guarantee the private investments of FutureGen's investors. A $600, $700 million obligation on the people of this state is unquestionably. But that may or may not occur. I mean, there is no FutureGen. So all of this may happen in the future. The lobbyists are able to do what lobbyists do. The administration changes its position. All that may happen. But is that the kind of case that this court should be deciding in this vacuum? As I said, Your Honor, I don't believe it is a vacuum. As long as the FutureGen alliance exists and as long as the procurement plan is still in place, which it is, I think the issues are sufficiently teed up for purposes of mootness. Also, though, I think maybe what your question is getting at is is this case likely to recur or is this issue likely to recur? Or occur at all. Right. But I think it most definitely will. It's worth noting in this regard that the IPA develops procurement plans annually. And if those agencies believe, because these orders are allowed to stay in place and because the appellate court order is allowed to stay in place, that they have the power to regulate ARIES in this manner, we can guarantee that they will do it again. I don't think it's reasonable to expect the commission to act like Cincinnati and return to its plow in the field or George Washington and return to Mount Vernon. If they think they have this power over ARIES, we can be sure they're going to use it. So this issue can be decided now and I think it should be decided now. And the converse of that is true, right, too. If we agree with your position that the ICC can't compel suppliers to purchase FutureGen's expensive power, then there will probably be the determination that there's no point in building FutureGen, right? That's one of the potential outcomes of a decision of this court. It is a potential outcome, Your Honor, but there's nothing stopping FutureGen from going back to the drawing board and figuring out another financing plan. They can certainly do that. A decision from this court would simply mean that they can't do it in a way that subjects ARIES to the procurement planning power of the commission and in a way that puts a $700 million indirect obligation on the backs of Illinois ratepayers. They could always go to the General Assembly and ask for $700 million. Now, I know, given the current environment, that's unlikely, but it's a possibility. They could ask local governments to issue some kind of bonds. There are a number of other ways that FutureGen could go about this. We're just saying that this one way is impermissible. Counsel, you, in response to Justice Tice, said these orders remain in place. What is the effect of those orders now, today? The effect of the orders right now is to bring ARIES within the procurement planning power of the commission. I think that's one of the most direct and important impacts now. More specifically in the context of why this is not moot, what's the effect of the order? I would repeat the same answer, Your Honor. I see I'm running out of time, if I may just briefly wrap up. This case, again, presents a straightforward issue of statutory interpretation. There is simply nothing to indicate, much less establish, that the legislature intended for the commission to control how ARIES private companies operating on the competitive market conduct their business. And there is surely nothing to indicate, much less establish, that the legislature intended to invest the commission with the power to saddle the ratepayers of this state with a $650 or $700 million obligation for energy they don't want, for energy they don't need, and most gallingly of all, for energy they will never receive, merely to guarantee a certain rate of return for favored projects, private investors. Agree with us on any of these points, Your Honor, and the orders must be overturned. If ARIES was out of the picture, right, I mean the ComEd customers would be hit with an increase, right? I don't believe they would, Your Honor, because of the operation of the rate cap. The amount that they can be charged is capped by statute. Okay. Thank you, Counsel. Thank you. Good morning. May it please the Court. Counsel. Counsel. Tom Stanton, Special Assistant on behalf of the Illinois Commerce Commission. Now, the appellees have divided the argument in three ways. I'd like to first address what I see as a challenge to the commission's authority to require ARIES to enter into the FutureGen sourcing agreement. Could you please speak up a little bit? That's what I see as the main argument. Thank you. After that, I'll address what I see as a challenge to the commission's authority to require only the utilities to enter into the FutureGen sourcing agreement. And then Mr. Price, on behalf of Commonwealth Edison, will address the reasonableness of the competitively neutral charge mechanism. And finally, Mr. Barry, on behalf of the FutureGen Industrial Alliance, will discuss the FutureGen project, its status, and also address any Commerce Clause arguments that need to be made. So this case involves an attempt by a group of regulated entities to resist their obligations enacted as part of the Clean Coal Portfolio Standard Law and to frustrate the commission's efforts to implement this retrofitted clean coal scheme, statutory scheme, consistent with the legislature's intent. So here, the ARIES, despite a clear legislative mandate to source electricity from clean coal electricities, including retrofitted clean coal facilities such as FutureGen 2.0, they claim that the IPA and the commission lack the authority to require them to enter into an approved FutureGen sourcing agreement to fulfill that sourcing mandate. They also claim that the commission lacks the authority to prove an efficient, fair, and reasonable cost recovery mechanism that recovers the cost of the supply customers and ARIES customers, but they're wrong on both accounts. The IPA was created in 2007 to purchase electricity through a competitive bidding process for the fixed bundled retail customers of the utilities, also called eligible retail customers. The two largest utilities, Ameren and Commonwealth Edison. Two years later, though, in 2009, the General Assembly passed the Clean Coal Portfolio Standard Law, which is relevant here, added the ARIES clean coal sourcing mandate, that's Section 16.115.D5, to the Public Utilities Act, and the Clean Coal Portfolio Standard, that's Section 175.D, to the IPA Act. Now, these amendments gave the IPA and the commission more authority in the procurement planning process with respect to retrofitted clean coal facilities, a very narrow category of clean coal facilities with respect to retrofitted clean coal facilities. So in this regard, the planning process has expanded to include the ARIES and their customers, and this can be seen in the first two sentences of Section 175.D5, that's the retrofit provision. So in the first sentence, the legislature directs the commission and the IPA to consider sourcing agreements with retrofitted clean coal facilities, and it's a shall consider, and it's without limitation. And that becomes clear in the second sentence when the legislature authorized these new owners of these retrofitted clean coal facilities to propose sourcing agreements with the utilities and the ARIES required to comply with Section 16.D.115. So it's clear that the legislature expanded this process to include the ARIES. Now, that makes sense because the IPA and the commission are the experts in electricity, and it's a process that when there's disputes over the sourcing agreements, when the parties get together and they can't resolve any of the disputes, they work together with the IPA first to get a consensus. But if they can't resolve any disputes, they go to the commission, and there's already an existing process, existing infrastructure used in the procurement planning process. So when council says that ARIES are not to be included as part of the Section 75.D.5, first two sentences get you right there. So in its order approving the 2013 procurement plan, the commission determined that it has the authority to order the ARIES to enter into the approved future gen sourcing agreement. Two provisions are pertinent. First is the ARIES sourcing obligation. Section 16.115.D.5 of the Public Utilities Act requires that ARIES source electricity from clean coal facilities, including clean coal facilities other than the initial clean coal facility. And retrofitted clean coal facilities were a subset of clean coal facilities, so therefore the ARIES are required to source their proportionate share of electricity from retrofitted clean coal facilities. Now the ARIES seek to frame the issue as involving their freedom to contract, but they've already agreed to source electricity from these retrofitted clean coal facilities as a statutory condition of obtaining a certificate of service from the commission to enter this retail market. And so once the commission determined that the future gen facility met the cost-based benchmarks, the ARIES sourcing obligation with future gen was fixed, self-executed, and the commission is authorized to enforce that mandate. So therefore when they talk about the ARIES are free to decide whether to source electricity from future gen 2.0, well that contradicts the Section 16.115.D.5 sourcing mandate. The second is the retrofit provision, that's Section 175.D.5, as I mentioned, of the IPA Act. And here the commission reasonably read the retrofit provision to allow it to require the ARIES to enter into the approved future gen sourcing agreement. The retrofit provision requires that the commission consider sourcing agreements with ARIES, and in light of the ARIES Section 16.115.D.5 sourcing mandate, the commission reasonably determined that it could require the ARIES to enter into that approved future gen sourcing agreement to fulfill that mandate. Now the ICA argues that by using the phrase utility sourcing agreement, the legislature intended to deny the IPA and the commission the power to require the ARIES to enter into an approved sourcing agreement. But an express affirmative grant of approval regarding the utilities, that doesn't mean that the legislature intended to deny the IPA and the commission the power to require the ARIES to enter into an approved sourcing agreement to fulfill the sourcing mandate. But unlike the ARIES, the utilities have no comparable self-executing sourcing mandate with retrofitted clean coal facilities. The IPA and the commission are the gatekeepers. They're the ones, the IPA is the one who procures the power for the IPA, and any sourcing decision would have to be made by the commission. So you need that provision in there to approve a utility sourcing agreement for the utilities because they don't have the authority to do it themselves. So the commission correctly rejected the statutory construction rule that the inclusion of one term necessarily excludes other possible terms. An application of that rule would defeat the legislature's intent here. So looking at the statutory scheme as a whole, the legislature intended that both utilities and ARIES would source electricity from a cost-effective retrofitted clean coal facility and then share in the costs of its service. It just doesn't make sense that the legislature would expressly authorize these new owners of retrofitted clean coal facilities to propose sourcing agreements with the IPA and the commission, but then deny the IPA and the commission the authority to require them to As the appellate court found, the retrofit provision clearly contemplates at the least that the IPA can consider such sourcing agreements with the ARIES in the procurement planning process, and if the IPA can consider those agreements, it's reasonable to presume that the IPA can compel ARIES to enter into sourcing agreements with such facilities as part of the procurement planning process. If it furthers that... The statute says may consider. Why does that mean require? Well, I don't think... No, that would apply to the utilities. For the ARIES, they have the sourcing amendment under 16.115.D5. It's self-executing. Once the commission found that the future gen facility met the cost-based benchmarks, they had an obligation to source. So there wasn't any... You didn't need anything additional from the commission, but what they... This proceeding was in two phases. The first phase was setting up the agreement and then resolving some of the disputes, and then the commission made the decision on whether the future gen facility met the cost-based benchmarks in a phase two proceeding. So in the first proceeding, the ARIES argued that they didn't have a sourcing mandate, that they could pick and choose which clean coal facilities, retrofitted clean coal facilities that they could source electricity from. But once the commission in the phase two order determined that the future gen benchmarks were met, they had the sourcing duty. And that's the end of the story. Now, in the first order, they had made those arguments, so the commission said, well, no, we think we have the authority to order you to enter into them. The first order that's under review here, that was contingent upon the commission making a finding in the phase two order that the future gen met those benchmarks, because if the future gen didn't meet those benchmarks, if the numbers came in and they were much higher than the cost-based benchmarks that were developed by the procurement administrator in conjunction with the IPA staff and the commission staff and ultimately approved by the commission, if those numbers came in higher, no sourcing obligation. So, like I said, the ARIES position is based on the premise that they have unfettered discretion to pick and choose which clean coal facilities that they can source from, but the clean coal law changed the status quo. Before that change, the ARIES had discretion to source. But now, once the commission finds that the future gen facility met those cost benchmarks, they have a sourcing obligation. Just a couple points. The ICA really mischaracterizes our brief when they talk about not required to implement any directive of the General Assembly. That was in reference when we were talking about the initial clean coal facility. We're contrasting the initial clean coal facility with the retrofitted clean coal facility. And with respect to the initial clean coal facility, the ICC has much less power. We have a secondary role. And so the legislature, with respect to the initial clean coal facility, had to authorize and act authorizing legislation for those provisions to become effective. And so it was in that context where the legislature would direct the commission in this new authorizing legislation. Obviously, anything in the provision of the retrofit provision or in the other provisions of the Public Utilities Act, the IP Act, of course will follow all the directives of the legislature. But it was in that context that that statement was made. I see that my time is up. So in conclusion, we would ask the court to affirm our orders. Thank you. Thank you. Good morning, Your Honor. May it please the court. My name is Matthew Price on behalf of Commonwealth Edison Company. I'm here to address one specific aspect of the appellate court's ruling, namely the portion ensuring that if the commission does have the power to order these contracts, then ComEd will be able to recover the resulting costs from ARIES customers through a competitively neutral charge. And this is the holding of paragraph 32 of the appellate court's opinion. Of course, if you agree with appellants that the commission had no power to order the contracts in the first place, you would need to reach this question. But if you do find the commission had authority, then it's vital that you also affirm the appellate court's holding on the competitively neutral charge. Before getting into that argument, Your Honors, I would like to briefly address the issue of mootness. I think it's important for the court to understand that the orders at issue here resulted in a contract. And between ComEd and FutureGen, there's an ongoing contractual obligation that ComEd now has to purchase electricity from FutureGen. And I understand the court's concern that FutureGen may no longer be able to fund itself. But if FutureGen somehow manages to keep going and build, as it says that it intends to, the result will be this contractual obligation. So this is really the court's only opportunity to address the legality of that contractual obligation and the commission orders that resulted in the contract. What if FutureGen doesn't go forward? Well, I agree with Your Honor that there's a possibility that the case may yet become moot in the future. But at this moment, the case is not moot. There's an ongoing controversy. There's an actual contractual obligation that exists in the here and now. And this is the court's one opportunity to address that contractual obligation. Is resolution of this appeal critical to the ability of the Alliance to obtain replacement funding? I have no knowledge of that. That's really a question that is, I think, appropriately answered by the Alliance's counsel, Your Honor. If there are no further questions, I move this turning to the competitively neutral charge. The commission viewed competitive neutrality as critical. And the reason it did is because it understood that ComEd's eligible retail customers are residential and small commercial customers who are least able to afford the bill increases that would result from the contract with FutureGen, in particular if they were forced to bear the entire cost. My brother counsel for the appellant said that there would be no cost increase. That's not right. The rate caps are actually higher, about one-third higher than the increase in bill costs that's expected under the current arrangement, where ComEd would be able to recoup its costs through a competitively neutral charge. So ComEd customers would experience a significant increase above the current increase if they were not able to recoup their costs through the competitively neutral charge. The second point I want to make is that designing a competitively neutral charge was well within the commission's discretion. Under Section 3855D6 of the IPA Act, it states the utility shall be entitled to full cost recovery pursuant to a contract entered under this subsection D. The commission's theory is the contract was ordered under the retrofit provision subsection D5. That's under this subsection D. And so the commission had the power to craft a cost recovery mechanism that would allow ComEd to recover its costs. And the competitively neutral charge, the statute doesn't say what that cost recovery mechanism must look like. It left wide discretion to the commission to design, using its expert judgment, an appropriate cost recovery mechanism. And the competitively neutral charge falls within that discretion. And, indeed, competitive neutrality is really mandated by the statute. And we explain this argument in detail on pages 24 through 26 of our brief. It's complicated because of the way the statute is drafted. But I'd urge the court to look at those pages of our brief and trace through the definition of sourcing agreement and the kinds of terms that must be included in a sourcing agreement to see that the legislature did not want to impose disproportionate costs on ComEd's eligible retail customers. And the final point I'd make is that that's consistent with the General Assembly's purpose as a whole in ensuring that retail electric competition will still be equitable to all customers. And when you have a project like FutureGen, which is designed to bring environmental and fuel diversity benefits to the state of Illinois as a whole from which all residents will benefit, it's equitable that all residents should share proportionately in those costs. If the court has no questions, I will turn the podium over to my brother. Thank you. May it please the court, counsel. My name is Kyle Berry, and I represent the FutureGen Industrial Alliance. First, as to the question of mootness, I'd like to provide a brief update. Since the briefing on the mootness question, the alliance has entered into a great interconnection agreement and made a payment pursuant to that of over $200,000. They've also renewed the option agreement to purchase the power plant in Maridocha, Illinois, along the Illinois River from Ameren. So they continue to pursue the project. They have also continued to engage in discussions with the administration in Washington and members of Congress to determine how to best protect the DOE funding for the project. Of course, there's no guarantee that that will happen. The money is still there. It hasn't expired yet, and they're working very vigorously on trying to protect it. We will, of course, let your honors know immediately if something changes, but as of right now, the project remains a going concern. And it remains a going concern because it's a very significant project. Illinois was selected as the site for this project after a national competition. It's a first-of-its-kind near-zero emissions power plant designed to show that coal can be used in an environmentally friendly way to generate electricity. Construction began on the project last August, and a lot has been done since then and before then. Over $200 million has been spent. And it's significant, I think, to emphasize the economic benefits that Illinois will enjoy if the project gets built, as the U of I study showed, $12 billion in economic impact in the state of Illinois, 1,000-plus construction jobs during the construction period, plus over 100 permanent jobs. Just to summarize, because I've got to close here, the Clean Coal Portfolio Standard wasn't designed for this project. The project, Version 2.0, didn't exist when the Clean Coal Portfolio Standard was created. And the retrofit provision, because it switched from a greenfield project, a new building from scratch, to a retrofit of the Maradochia Power Plant, the retrofit provision was perfectly set up for this project. And it serves as an invitation for a project like this to apply for the benefits under the retrofit provision, which is exactly what FutureGen did. In the end, the commission looked at the statutory scheme, which is complex. It involves both the Public Utilities Act and the Illinois Power Agency Act. And it interpreted it in a way that made the statutory scheme work. It gave effect to the Clean Coal Portfolio Standard to encourage the development of a project. And in terms of making who the rate payers are to support the project, the commission did so in a competitively neutral way, which is what the rate relief law has as its foundation in making sure that the rate payers pay on a fair basis. And in terms of the Commerce Clause, real briefly, the appellants haven't shown that the statutory scheme discriminates against out-of-state projects. It's facially neutral. There's no discrimination. And the harm here is entirely hypothetical. And given the states of Illinois' investment in the project, I think it can be seen as having served as a market participant. Thank you very much for your time. We urge you to uphold the decision and affirm the decision of the appellate court. Thank you. Thank you, Counsel. Thank you. Your Honors, counsel for the commission pointed to the certification requirements in Section 16-115B of the IPA Act and said that because areas are required to source clean coal from somewhere, it has the power to tell them how to meet that requirement. But, Your Honors, that's like saying that because the government can set fuel economy standards, it can tell Ford or GM exactly where to buy its engine parts. Now, it may be the case in that scenario that only one company supplies the engine parts that Ford needs to comply with those standards. But there is a very big difference. There is a world of difference, in due process terms alone, between Ford being ordered by a government agency to contract with another private party on that agency's terms and Ford doing so on its own terms because of the circumstances of available supply. We don't deny that areas are required to source clean coal electricity from somewhere, provided it's available. But areas have a right, as private companies operating on a competitive market, to decide how to meet that obligation for themselves. So the fact that the certification requirement requires areas to source clean coal electricity generally really doesn't advance the Commission's argument at all. In fact, I think that provision is more notable for what it doesn't say rather than what it does. It doesn't say how areas must meet their clean coal sourcing obligation. It doesn't say that the Commission can order areas or tell them how to meet that obligation. And it doesn't say that areas are subject to the Commission's procurement planning authority. The Commission simply assumes that it has all of those powers, despite the fact of any clear statutory support for that conclusion. Under any reasonable definitions, Your Honor, that is not how a competitive market operates. Getting at the questions from Justice Garmon and Justice Tice regarding mootness, I'd like to build just briefly on the comments from my co-counsel from ComEd. As long as these orders are still in place, utilities customers and areas customers could still be subject to the competitively neutral charge. That can be used as a springboard for future to find alternative financing. So that charge can still be imposed. There's nothing in the statutory scheme of which I'm aware that specifically conditions the existence of that billion dollar grant on the effectiveness of that charge. Justice Thomas, I just wanted to clarify my answer to your question about the rate cap. ComEd's counsel is correct. I didn't mean to say that utilities customers would never see a price hike under this plan, only that they couldn't be forced to carry the entire load themselves, only a fraction of that load. I think an opinion that came out from the ComEd proposing counsel drawing the distinction between the Taylor Bill situation and the statutory authority, you heard his answer to that. I did, Your Honor. I'm sorry. He indicated there was a need for statutory authority in the Taylor Bill situation. We're here. There was no need for that. I think your position was the legislature knew how to do it when they wanted to if they wanted to put areas in. That's exactly my position, Your Honor, and that's my response to that. There was an opinion that came out this summer from the U.S. Supreme Court that I think is germane to the discussion here. It's called Michigan versus the EPA. There the court was discussing Chevron analysis, which, of course, is the same as Illinois statutory analysis when we're discussing deference to administrative decisions and the like. There the court said that Chevron allows agencies to choose among competing reasonable interpretations of a statute. It does not license interpretive gerrymanders under which an agency keeps part of the statutory context it likes while throwing away part it does not. That is precisely what we have in this case. And for that reason, we ask that the commission's orders be reversed with regard to the future Gen 2.0 financing plan. Thank you, Your Honor. Thank you. Case number 118129, Commonwealth Medicine Company et al. versus Illinois Commerce Commission et al. will be taken under advisement as agenda number 12. Mr. Amarillo, Mr. Price, Mr. Stanton, Mr. Berry, thank you for your fine arguments this morning. You are excused at this time and, Marshall, the Supreme Court stands adjourned until Tuesday, September 22nd, 930 a.m.